**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ROMAN SHARIKOV,

                                Plaintiff,                      1:22-cv-00326 (BKS/DJS)

v.

PHILIPS MEDICAL SYSTEMS MR, INC.,

                                Defendant.

_____

**Appearances:**

_Plaintiff Pro Se:_
Roman Sharikov
Waterford, NY 12188

_For Defendant:_
Robert C. Petrulis
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square – Suite 4130
Cleveland, OH 44114

Jamie Haar
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
599 Lexington Avenue
New York, NY 10022

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.     **INTRODUCTION**

       Plaintiff _pro se_ Roman Sharikov brings this action against Defendant Philips Medical

Systems MR, Inc. alleging discrimination and retaliation claims under the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 in connection with Defendant's

application of its COVID-19 policy. (Dkt. Nos. 1, 24). Plaintiff also alleges state law wrongful

termination and breach of contract claims. (Dkt. No. 1). Presently before the Court is

Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. No. 13-1). Plaintiff cross-moves to strike Defendant's motion to dismiss, or certain statements made therein, and to amend the Complaint. (Dkt. Nos. 21, 24). Defendant opposes those motions. (Dkt. Nos. 22, 25). For the following reasons, the Court denies Plaintiff's cross-motion to strike, denies Plaintiff's cross-motion to amend as futile, and grants Defendant's motion to dismiss.

## II.     CROSS-MOTION TO AMEND THE COMPLAINT

With his cross-motion to amend, Plaintiff has submitted a proposed Amended Complaint raising only claims under the ADA. (Dkt. No. 24). Defendant argues that the motion should be denied because Plaintiff failed to submit a redline/strikeout version or otherwise identify the amendments, as required by Local Rule 15.1(a). (Dkt. No. 25). Defendant further argues that the amendment is futile and cannot save Plaintiff's claims from dismissal. (*Id.*).

In general, leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "District courts in this Circuit have repeatedly explained that, when faced with an amended complaint, they may either deny a pending motion to dismiss as moot or consider the merits of the motion, analyzing the facts as alleged in the amended pleading." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020) (citing *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 291 (E.D.N.Y. 2016)).

Since Defendant has had a full opportunity to respond to the proposed amendment, the primary ADA claims remain the same, and Plaintiff is proceeding *pro se*, the Court considers the merits of the motions to dismiss in light of the proposed Amended Complaint.[1] If the claims in

---

[1] While the Court will overlook Plaintiff's failure to comply with Local Rule 15.1(a) this time, Plaintiff is warned that any future submissions must comply with the Court's Local Rules.

the proposed Amended Complaint cannot survive the motion to dismiss, then Plaintiff's cross-motion to amend will be denied as futile. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." (citation omitted)), *abrogated on other grounds by Knick v. Twp. Of Scott, Pa.*, 139 S. Ct. 2162 (2019).

## III.   FACTS[2]

On September 5, 2016, Plaintiff began working for Defendant as an MR Global Support Specialist in Latham, New York, providing technical and administrative support to MRI magnet experts. (Dkt. No. 24, at 4, 7; Dkt. No. 24-1, ¶ 9). From "May 8, 2020 through November 8, 2021, the plaintiff and his colleagues were made aware of a newly adopted '[COVID]-19 policy' which told all employees to wear masks and gloves at work as well as when commuting to work, to answer daily medical inquiries in a questionnaire, to remain physically isolated from other workers, to perform weekly self-examinations or to get '[COVID]-19 vaccinations'[,] . . . to enter [their] 'vaccine status' on an online portal as a condition of employment, to limit [their] access to certain office areas based upon 'vaccine status,' and to accept segregation based upon 'vaccine status'" (the "COVID-19 Policy"). (Dkt. No. 24, at 7). On June 23, July 13, and August 18, 2020, Plaintiff received "repetitive emails" from the executive assistant to the facility general manager "informing [Plaintiff] that [he] has to wear a mask in order to be allowed to enter the work site" and "to use a temperature scanner that displays [his] temperature to anyone looking at the screen." (Dkt. No. 24-1, ¶ 11; Dkt. No. 24-2, at 5–14).

---

[2] The facts are drawn from the proposed Amended Complaint and its exhibits. (Dkt. Nos. 24, 24-1, 24-2). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

Plaintiff alleges that on August 14, 2020, he received an email from Defendant telling him to "wear a mask while working and even when [he is] not working, such as during travel to public venues." (Dkt. No. 24-1, ¶ 12; Dkt. No. 24-2, at 15–16). The email cited by Plaintiff is a "Philips North America COVID-19 Weekly Update" for employees regarding the mask policy "while performing work on behalf of [Defendant]"; it states that employees who are required to wear a mask must wear it "for the entire duration of work performed, including in public venues like restaurants or gas stations," with certain exceptions. (Dkt. No. 24-2, at 15–16).

Throughout March and April 2021, the "Risk Management team posted . . . signs throughout the office" regarding social distancing in the office, using gloves and masks, and the use of the elevator and stairs. (Dkt. No. 24-1, ¶ 14; Dkt. No. 24-2, at 19). On March 25, 2021, Plaintiff received an email from Vitor Rocha, Chief Market Leader, directing Plaintiff to "submit a daily medical screening questionnaire," and answer whether he has had any contact with infectious people, in addition to the ongoing "temperature checks, masking and staying isolated [] from others in the office place." (Dkt. No. 24-1, ¶ 13). The email cited by Plaintiff, directed to "U.S. employees," describes the policies Defendant has taken, including "screening protocols for all entry points" "to ensure we can safely open our doors to more employees." (Dkt. No. 24-2, at 17–18). On June 4, 2021, Christopher Hoag, Senior Service Manager, sent an email to Plaintiff and five others with the subject line "Covid Update – Return to Office." (*Id.* at 20). In it, Hoag explained that around "the beginning of July," Defendant expected to "go from Medium to low risk," at which point Defendant's "Mask policy" would allow "masks [to] be removed once you sit at your desk but if anyone visits your desk then you are required to be masked." (*Id.*). Plaintiff viewed this email as a "personal[] request[]" that Plaintiff "wear a mask whenever someone comes to [his] desk to talk with [him]." (Dkt. No. 24-1, ¶ 15).

On August 16, 2021, Plaintiff received an email employee update with the subject line "Safe@Work Update: Return to Medium Risk in the U.S." (Dkt. No. 24-2, at 21). This email noted that workspace reservations via "the Planon tool remain a requirement for entry to the office daily," and provided a "protocol for reporting COVID cases." (*Id.* at 21–23). Plaintiff asserts that this email from Defendant "coerc[ed] [him] to enter [his] personal medical data on the 'Planon' app," and enabled Defendant to "mak[e] a record of the disability they regard [Plaintiff] has having." (Dkt. No. 24-1, ¶ 16). Defendant did not allow Plaintiff "to claim [his] right to informed consent or to refuse any of these measures." (*Id.*).

On August 17, 2021, Defendant's "Risk management team posted more harassing signs throughout the office." (*Id.* ¶ 17). The signs indicated that "[f]ully vaccinated employees" were permitted to remove their masks when "[a]lone in closed door room" or "sitting at desk/workspace" but that "[u]nvaccinated employees could not." (Dkt. No. 24-2, at 24). Plaintiff asserts that because employees were "segregated . . . based on their status of complying with certain medical procedures . . . everyone [would] know who is 'vaccinated' by the access they get." (Dkt. No. 24-1, ¶ 17). Based on this sign, Plaintiff concluded that "the company is keeping records" of vaccination. (*Id.*).

The next day, Tom McGrew, an Environment Health and Safety Engineer, "came up to [Plaintiff] in the hallway, and demanded that [Plaintiff] cover [his] face with a mask," and Plaintiff told him he was not sick. (*Id.* ¶ 18).

On August 25, 2021, Plaintiff received an email with the subject line "Safe@Work Update: Customer facing requirements." (Dkt. No. 24-1, ¶ 19; Dkt. No. 24-2, at 25). The email contained a reminder "for U.S. employees" "that customer-facing employees must meet our customers' requirements for medical testing and vaccinations, including COVID-19." (Dkt. No.

24-2, at 25). Plaintiff viewed this email as indicating that "customers are demanding that [he] get[s] injections," which is "why [Defendant is] coercing [Plaintiff] to get injected." (Dkt. No. 24-1, ¶ 19; Dkt. No. 24-2, at 25–26). Plaintiff could "only conclude that [customers] believe [he] is an infectious threat because [his] employer is telling all customers that [he is] contagious." (Dkt. No. 24-1, ¶ 19).

On September 10, 2021, Plaintiff received another "Safe@Work Update" email from Defendant. (Dkt. No. 24-1, ¶ 20; Dkt. No. 24-2, at 27–28). The email indicated that the U.S. Department of Labor's Occupational Safety and Health Administration was "developing a rule" that was "expected to apply to Philips and [its] U.S.-based employees" that "will require" a "fully vaccinated" workforce "or require workers who remain unvaccinated to produce a negative test on at least a weekly basis before coming into work." (Dkt. No. 24-2, at 27). Plaintiff construed this informing him "that as a condition of [his] employment [he] will now be required to give tissue[] samples on a regular basis or get experimental injections because of both [Defendant's] policy and the newly announced 'customer[']s policy.'" (Dkt. No. 24-1, ¶ 20; Dkt. No. 24-2, at 27–28). Six days later, Plaintiff received an email from McGrew, with an attached "updated Latham mask policy" which discussed masking and "the segregation of employees based on their 'vaccine' status." (Dkt. No. 24-1, ¶ 21; Dkt. No. 24-2, at 29–30). Under this policy unvaccinated individuals were required to "wear a Phillips-provided surgical mask at all times, except when eating/drinking." (Dkt. No. 24-2, at 30).

On October 27, 2021, Plaintiff received an email outlining Defendant's vaccination policy:

> Effective December 8, 2021, employees based in the U.S. are required to be vaccinated against COVID, as a condition of employment [with Defendant]. . . . This policy applies to all employees, not just those who work directly on or with government

contracts. It also applies to all work environments, from our manufacturing facilities, corporate officers and call centers, to the field, customer sites and home. . . . U.S. employees must provide proof of vaccination by January 10, 2022, or have requested and qualified for a reasonable accommodation. Employees who remain noncompliant will be considered a voluntary quit on February 4, 2022.

(*Id.* at 31). Defendant's vaccination mandate "identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no request for exemption." (Dkt. No. 24, at 5; *see* Dkt. No. 24-1, ¶ 22; Dkt. No. 24-2, at 34–35).

On November 16, 2021, Plaintiff "scheduled a confidential intake meeting with Mary McDermott, Senior [M]anager, Human Resources[,] to document and discuss the harassment and discrimination [he had] been experiencing"; Plaintiff "sent her a written 'Notice of [D]iscrimination and [H]arassment based upon [D]isability' . . . prior to the meeting." (Dkt. No. 24, at 8; Dkt. No. 24-1, ¶ 24). Plaintiff alleges that he gave written notice that he was claiming his rights "to informed consent; to refuse experimental medical treatments; to refuse non-job-related medical inquiries or treatments; to be excluded from the policy based upon disability rights; to refuse a voluntary policy; and to work in an environment free of discrimination or retaliation for claiming his rights under the protection of the ADA." (Dkt. No. 24, at 8). The next day, McDermott "cancelled" the meeting; Plaintiff and McDermott agreed to reschedule the meeting for November 19, 2021, and McDermott invited Suellen Mallette, Project Manager. (Dkt. No. 24-1, ¶ 26). That same day, Defendant sent an email with the subject line "$500 for U.S. Hourly Employees," offering "a $500 incentive to every full-time hourly/non-exempt worker who provides proof of vaccination . . . by January 10, 2022." (Dkt. No. 24-2, at 46–47).

Plaintiff states that Defendant was "offering [him] $500 to upload [his] proof of injections to the company portal." (Dkt. No. 24-1, ¶ 25).

At a meeting on November 19, 2021, Plaintiff told McDermott and Mallette that he "was invoking his rights under ADA because [he] was being regarded as disabled by the company." (*Id.* ¶ 27). McDermott responded by denying Plaintiff's allegations and telling him that "no one [was] harassing [him] or violating [his] rights." (*Id.*). McDermott said that Plaintiff "would have to comply otherwise [Defendant] would say [he] had resigned." (*Id.*). McDermott "threatened [Plaintiff's] ongoing immigration process mentioning that if [he] did not comply" they "were not going to support" his work VISA anymore; according to Plaintiff, Defendant "would make the false claim that he voluntarily quit." (Dkt. No. 24, at 8; *see* Dkt. No. 24-1, ¶ 27). McDermott "called [Plaintiff] 'unvaccinated'[, and then] . . . put on her mask and asked [him] to wear a mask." (Dkt. No. 24-1, ¶ 28). Plaintiff inquired about "the individualized assessment [Defendant] was relying upon to consider [him] a direct threat," any "proof of liability insurance for these interventions," and for "the data retention policy for [Defendant's] portal," but McDermott never provided him with any answers. (*Id.*; Dkt. No. 24, at 8).

Plaintiff alleges that on November 22, 2021, he received an email from "Customer Credentials team stating that [he has] to submit to certain testing, vaccinations, mask wearing and other medical procedures if any customer requests it." (Dkt. No. 24-1, ¶ 29). The email noted that it "was sent to a wide distribution of employees," but told employees to "disregard this message if you DO NOT go into customer facilities." (Dkt. No. 24-2, at 48). The email included information on healthcare vendor credentialing, and the standards that "apply to all customer-facing Philips personnel who visit temporarily, or are based full-time at a hospital/health

8

system/clinical setting." (*Id.* at 48, 53–62). Plaintiff viewed this email as "classif[ying] [Plaintiff] as 'unvaccinated.'" (Dkt. No. 24-1, ¶ 29).

On December 8, 2021, Plaintiff received a company email "requiring [him] to upload [his] vaccination status and documents to the . . . portal." (*Id.* ¶ 30; Dkt. No. 24-2, at 63–65). The email stated "[i]n accordance with our . . . global policy, we will require vaccination of all employees, aligning where needed with local laws, government and health authority policies and practices." (Dkt. No. 24-2, at 63). On December 9, 2021, Plaintiff received an email from Mallette informing employees that "the process to upload your vaccination status is now open" and attaching a document containing instructions. (Dkt. No. 24-1, ¶ 31; Dkt. No. 24-2, at 68). The same day, Plaintiff "submitted a complaint to [Defendant's] global ethics complaint report system" ("speak up report"). (Dkt. No. 24-1, ¶ 31; Dkt. No. 24-2, at 69–70, 127–28). In this complaint, Plaintiff asserted that Defendant "regard[s] him as having a disability (an impaired immune system and an impaired respiratory system) without any diagnosis or individualized assessment and has also made a record of such disability by mis-classifying [him] as having, in ADA terms, a mental or physical impairment," and that Defendant is "coercing [Plaintiff] to submit to medical examinations and interventions as accommodations . . . without any informed consent." (Dkt. No. 24-2, at 69). Plaintiff further "demand[ed] to review the records [Defendant] [] relied upon to determine that [he is] a direct threat." (*Id.*). Plaintiff stated that Defendant "threatened [him] with termination of [his] employment, abortion of [his] immigration process, [and] removing [him] from [the] workspace." (*Id.*).

The next day, Plaintiff "filed a [c]harge of discrimination with the [Equal Employment Opportunity Commission] claiming that [Defendant] had adopted a policy which regarded him as disabled with a contagious disease without any assessment"; that Defendant's policy did not

recognize "his right to refuse accommodations"; and that Defendant was "threatening to fire him as a result of claiming his rights." (Dkt. No. 24, at 9; Dkt. No. 24-1, ¶ 32; Dkt. No. 24-2, at 71–73). On January 6, 2022, the EEOC sent Plaintiff a right to sue letter. (Dkt. No. 24-1, ¶ 41; Dkt. No. 24-2, at 111–12).

On December 15, 2021, Plaintiff received an email with "instructions on how to upload [his] 'vaccination status,'" but the instructions did not mention "any option to refuse" the vaccine, "a risk benefit analysis, or an option to exercise [his] rights under the ADA." (Dkt. No. 24-1, ¶ 34; Dkt. No. 24-2, at 76–78). The next day, Plaintiff emailed McDermott and Jonathon Glazier, Head of Legal Compliance, and informed them that he filed a charge with the EEOC, but "neither of them replied." (Dkt. No. 24-1, ¶ 35; Dkt. No. 24-2, at 79–80). Plaintiff also sent them both an email informing them "that he was responding to the requests but could not use the online portal without waiving his rights to medical privacy." (Dkt. No. 24, at 9; Dkt. No. 24-1, ¶ 36; Dkt. No. 24-2, at 81–85).

On December 21, 2021, Plaintiff received another email from McGrew with an attached "COVID 19 Update." (Dkt. No. 24-2, at 92–93). The update reminded employees of the ongoing mask policy, and of Defendant's quarantine policy in the event of "close contact exposure." (Dkt. No. 24-1, ¶ 37; Dkt. No. 24-2, at 92–93).

In an email dated January 4, 2022, to McDermott and McGrew, Plaintiff wrote that he "simply want[ed] to do [his] job without being harassed and interrupted." (Dkt. No. 24-2, at 113). Plaintiff attached a copy of McGrew's December 21, 2021, "COVID 19 Update" as "an example of harassing and discriminatory communication [he] ha[d] been receiving from the company and its employees since May 2020." (*Id.* at 113–114). Plaintiff asserted that the communication "regards [him] as an individual with an actual or potential contagious disease

and impaired immune and respiratory systems." (*Id.* at 113). Plaintiff wrote that he was being

coerced "to submit to . . . medical interventions and examinations (such as wearing medical

devices – masks, face shields; collecting vital statistics, urging to do some testing with a

collection of histological samples, [and] experimental drug injections . . .)" and that he "found all

of this discriminatory, harassing, creating hostile work environment, fear-mongering and causing

me a lot of stress and health issues." (*Id.*). Plaintiff stated that working "in the very stressful and

harmful environment since May 2020" has "caused [him] a lot of harm" and that he "cannot

sleep normally," has rashes, feels tired and sick, "cannot concentrate on work after receiving

communications" like the "COVID 19 Update," feels anxious, isolated, segregated and targeted.

(*Id.*). Plaintiff stated that he had asked HR "for support but didn't get any and only been

threatened more." (*Id.*). Plaintiff requested that McDermott and McGrew "make a proper record

of occupational illness/injury for" him and "share what is the company's procedure . . . on

reporting to OSHA or other agencies." (*Id.*). Plaintiff also requested that McGrew "develop a

plan how the stress [he] work[s] in can be eliminated?" (*Id.*).

From January 4 to 20, 2022, Plaintiff received various emails informing employees "that

January 10 was the deadline to post vaccine status or request religious or medical exemptions."

(Dkt. No. 24-1, ¶ 42; Dkt. No. 24-2, at 115–21). On January 20, 2022, Plaintiff again emailed

McDermott and "claimed his right[s] to informed consent," to "refuse experimental injections,"

and to "refuse non-job-related medical inquiries"; however, McDermott, Schrader, and other

employees of Defendant "ignored this notice and continued to send emails threatening to fire"

Plaintiff. (Dkt. No. 24, at 9; Dkt. No. 24-2, at 122–23).

On February 2, 2022, Plaintiff's Manager, Michael Schrader, Director of Business

Development, called Plaintiff and informed him that Defendant "was going to fire him effective

February 4[] for not being 'vaccinated,'" and that Defendant would "list the firing as a 'voluntary' resignation[,] which would affect any claim for unemployment benefits." (Dkt. No. 24, at 9–10; Dkt. No. 24-1, ¶ 43). After speaking with Schrader, Plaintiff "notice[d] that [his] access" to his "company intranet accounts was blocked." (Dkt. No. 24-1, ¶ 46). That same day, Plaintiff sent McDermott, Schrader, Glazier, and Anthony Wareham, Global Head of Health and Safety, a letter explaining that he is not voluntarily quitting, requesting a termination letter, and asserting his rights under the ADA. (Dkt. No. 24, at 10; Dkt. No. 24-1, ¶¶ 43–46; Dkt. No. 24-2, at 125–26). However, McDermott stated that "not complying with the '[COVID] policy' is 'resigning,'" and refused to provide a termination letter. (Dkt. No. 24, at 10; Dkt. No. 24-1, ¶ 44).

On February 3, 2022, Plaintiff contacted Information Technology Services about restoring his accounts, and it informed Plaintiff he would need to contact Human Resources "to unblock his account." (Dkt. No. 24-1, ¶¶ 47–48). The next day, Plaintiff sent an email to McDermott, Glazier, and Schrader asking them to investigate the complaint/speak up report he submitted on December 9, 2021; asserting that Defendant is retaliating against him for opposing its discriminatory policy; and reminding them that he has "clearly and repeatedly asked for accommodation or exemption based upon my rights including rights protected under the ADA." (*Id.* ¶ 50; Dkt. No. 24-2, at 127). On February 4, 2022, McDermott emailed Defendant's "response to [Plaintiff's] Philips Speak Up report." (Dkt. No. 24-2, at 128). In it, the "GBP team" stated that Defendant "has implemented a vaccine mandate," and that if Plaintiff had "a sincerely held religious belief and/or disability impacting your ability to obtain the COVID vaccine," he should "request a reasonable accommodation via the HR portal." (Dkt. No. 24-1, ¶ 51; Dkt. No. 24-2, at 128–30).

On February 7, 2022, Plaintiff's former co-workers contacted him and "stated that they were told that [] [P]laintiff quit his job." (Dkt. No. 24, at 10; Dkt. No. 24-1, ¶ 52). On February 8, 2022, Plaintiff sent an email to Glazier, Schrader, McDermott, and Noel Denice, Legal Counsel, "stating that [his] employer created a false employment record that [he] resigned." (Dkt. No. 24-1, ¶ 53; Dkt. No. 24-2, at 131–32). That same day, Defendant's legal counsel responded by "stat[ing] that he is unaware of any false employment records" and stating that Plaintiff was free to pursue "an exemption, which is a process all employees could avail themselves." (Dkt. No, 24-1, ¶ 54; Dkt. No. 24-2, at 133).[3] Plaintiff alleges that there were "no published criteria listed for the exemptions." (Dkt. No. 24-1, ¶ 54).

On February 9, 2022, Plaintiff sent an email to Glazier, Schrader, McDermott and Denice stating that Defendant is "refusing to recognize established rights" and "interfering with [his] protected rights." (Dkt. No. 24, at 10; Dkt. No. 24-1, ¶ 55; Dkt. No. 24-2, at 135). That same day, Plaintiff emailed Glazier, Schrader and McDermott seeking payment "in full for the services rendered as [he] was fired on Friday[, February 4, 2022]." (Dkt. No. 24-1, ¶ 56; Dkt. No. 24-2, at 136). On March 31, 2022, Plaintiff "was denied Unemployment Insurance benefits because [] [D]efendant falsely claimed that [] [P]laintiff had voluntarily quit his job." (Dkt. No. 24, at 10–11).

## IV.   STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell*

---

[3] Defendant claims that, following his termination, his manager asked him to "submit a request for [a] religious exemption," and Plaintiff felt that his manager was "coercing [him] to waive [his] rights." (Dkt. No. 24-1, ¶ 45).

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). A *pro se* plaintiff's complaint "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## V.   DISCUSSION

### A.   Discrimination under the ADA

The ADA prohibits discrimination against a "qualified individual on the basis of disability in regard to . . . [the] "discharge of employees" and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a claim for discrimination under the ADA, a plaintiff must allege that "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 486 (S.D.N.Y. June

29, 2017) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005)). A complaint is sufficient "if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in [42 U.S.C. § 12102(3)])." 42 U.S.C. § 12102(1). Plaintiff alleges that he was disabled under subsections B and C – because Defendant regarded him as having an impairment and because Defendant made a record of his impairment.

### 1.    "Regarded As" Having a Disability

The statutory definition of impairment under the "regarded as" prong is more lenient than that under the "record of" prong. Section 12102(3)(A) states that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A); *see Hilton v. Wright*, 673 F.3d 120, 128–29 (2d Cir. 2012) (explaining that the "regarded as" prong applies "*whether or not* the impairment limits *or is perceived* to limit a major life activity" (emphasis in original)). Section 12102(3)(B) further provides that the "regarded as" prong "does not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B); *see Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 606 (E.D.N.Y. 2013). "When a plaintiff brings a claim [under the 'regarded as' prong] . . . 'the decisive issue is the employer's perception of his or her employee's alleged impairment.'"

*Sacks v. Gandhi Eng'g*, 999 F. Supp. 2d at 633 (S.D.N.Y. Feb. 27, 2014) (quoting *Giordano v. City of N.Y.*, 274 F.3d 740, 748 (2d Cir. 2001)).

Plaintiff alleges that Defendant regarded him as if he "carried a specific, active, infectious disease, or as if [he] had an impaired or suppressed immune system that made [him] prone to contracting [COVID]-19." (Dkt. No. 24, at 5 (internal quotation marks omitted)). Specifically, Plaintiff alleges that Defendant "regarded [him] as having '[COVID]-19' or being prone to getting infected with '[COVID]-19.'" (*Id.* at 9, 13–14). Defendant responds that it did not treat Plaintiff as having a disability because it merely treated him as if he may contract a disease, which does not constitute a disability under this prong. (Dkt. No. 13, at 16–24). Further, Defendant claims that "to the extent Plaintiff alleges that Defendant believed that he actually had COVID-19, without any additional facts, any perceived impairment was transitory and minor." (*Id.* at 24).

The allegation that Defendant perceived Plaintiff as *potentially* infectious fails to plausibly allege a claim that the that Defendant regarded Plaintiff as having an impairment. *See Equal Emp. Opp'y Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019) ("[T]he disability definition in the ADA does not cover th[e] case where an employer perceives a person to be presently healthy with only a potential to become ill and disabled in the future."); *Jorgenson v. Conduent Transp. Sols., Inc.*, No. 22-cv-1648, 2023 WL 1472022, at *4, 2023 U.S. Dist. LEXIS 18463, at *10 (D. Md. Feb. 2, 2023) (dismissing a plaintiff's "regarded as" ADA claim because requiring employees to attest to their vaccination status "does not plausibly reflect a determination or belief that any of its employees are disabled or impaired"); *Earl v. Good Samaritan Hosp. of Suffern*, No. 20-cv-3119, 2021 WL 4462413, at *6, 2021 U.S. Dist. LEXIS 186182, at *15 (S.D.N.Y. Sept. 28, 2021) (finding that the plaintiff "failed to plausibly allege

that [his employer] perceived him to be disabled based on his potential to infect patients with COVID-19" because the "perception of infectiousness is not the same as perceived disability").

Courts have dismissed claims that employees subject to COVID-19 vaccination policies were regarded as having an impairment. As one court noted, this claim is implausible because inferring "that [Defendant] regarded [a plaintiff] as having a disability would require inferring that [Defendant] regarded all of its [] employees as having a disability." *Shklyar v. Carboline Co.*, No. 22-cv-391, 2022 WL 2867073, at *5, 2022 U.S. Dist. LEXIS 129546, at *13 (E.D. Mo. July 21, 2022), *aff'd* 2023 WL 1487782, 2023 U.S. App. LEXIS 2713 (8th Cir. Feb. 3, 2023); *see also Speaks v. Health Sys. Mgmt., Inc.*, No. 22-cv-00077, 2022 WL 3448649, at *5, 2022 U.S. Dist. LEXIS 146840, at *11–12 (W.D.N.C. Aug. 17, 2022) (finding "no plausible basis to conclude that [employer] regarded [the plaintiff] as having a 'physical or mental impairment'" because the employer "only regarded [the plaintiff] as being required – like all of its employees – to obtain a COVID-19 vaccine or be approved for an exemption and then 'regarded' her as having failed to do so by the deadline to become vaccinated").

Nor has Plaintiff plausibly alleged that Defendant regarded him as having an impairment due to COVID-19. The pleadings are bereft of any factual allegations that would make this assertion plausible. Plaintiff does not allege that he exhibited any symptoms of COVID-19 or that Defendant treated him as if he had particular symptoms of COVID-19. (*See generally* Dkt. Nos. 24, 24-1). Further, even if there were facts indicating that Defendant believed that Plaintiff contracted COVID-19, without any additional facts, this is insufficient to allege a non-transitory impairment.[4] Courts have generally held that an employer perceiving a plaintiff as having

---

[4] The Court notes that recently, in a Technical Assistance Questions and Answers regarding COVID-19 and the ADA, the EEOC noted that individuals infected with COVID-19 who exhibit "mild symptoms similar to the common cold or flu that resolve in a matter of weeks" are not disabled for the purposes of the ADA; however, "an individual with COVID-19 might have an actual disability" depending on "the specific facts involved in a particular employee's

COVID-19, without the plaintiff enumerating specific symptoms or long-term effects, does not constitute 'regarded as' disabled under the ADA. *Thompson v. City of Tualatin*, No. 21-cv-1587, 2022 WL 742682, at *2, 2022 U.S. Dist. LEXIS 43889, at *6–7 (D. Or. Mar. 11, 2022) (dismissing claim that employer, by applying its COVID-19 masking and vaccination policy, perceived the plaintiff as having a contagious disease: since the "vast majority of COVID-19 cases last fewer than 20 days" "being perceived as having COVID-19 is not a cognizable disability under the ADA."); *see also Payne v. Woods Servs.*, 520 F. Supp. 3d 670, 679 (E.D. Pa. 2021) (finding that a plaintiff alleging that he was discriminated against based on a COVID-19 diagnosis, without any facts regarding his symptoms or impairments failed to plausibly allege "that he was 'regarded as' disabled").

Thus, having failed to allege facts from which it could be plausibly inferred that Defendant perceived Plaintiff as having COVID-19, much less a non-transitory form of COVID-19 that would constitute an impairment, the "regarded as" having a disability claim must be dismissed.

### 2.    "Record of" a Disability

Plaintiff claims that Defendant "ma[de] a record of [Plaintiff's] impairment . . . by documenting [P]laintiff's 'vaccination status,'" and by "classifying the [P]laintiff as an 'unvaccinated' employee." (Dkt. No. 24, at 5, 19). Although Defendant failed to respond to Plaintiff's "record of" allegation, (*see* Dkt. No. 13-1), the "record of" claim fails for the reasons addressed by the parties—Plaintiff's failure to plausibly allege an impairment.

---

medical condition." EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last updated July 12, 2022).

To demonstrate "a record" of an impairment, a plaintiff must establish that he has "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1).[5] Major life activities include working, communicating, and interacting with others. *Id.* § 1630.2(i). "To be substantially impaired from performing a major life activity, a plaintiff must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Grullon v. Admin. for Child.'s Servs.*, No. 18-cv-3129, 2021 WL 981848, at *12, 2021 U.S. Dist. LEXIS 49614, at *37 (S.D.N.Y. Mar. 16, 2021) (internal quotation marks and citation omitted).

Plaintiff has not plausibly alleged that Defendant created a record of an impairment by misclassifying him as having a disability. The Amended Complaint contains no factual allegations whatsoever that Plaintiff was misclassified as having any physical or mental impairment that substantially limited a major life activity. Although "'record of' disability claims under 42 U.S.C. § 12102(1)(A)-(B) . . . explicitly include 'transitory' impairments as actionable impairments," *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 94 (2d Cir. 2021) (citing 28 C.F.R. § 35.108(d)(1)(ix)), there are no facts alleged that would allow an inference that Defendant misclassified Plaintiff as having a "record of" a transitory impairment, either.

Plaintiff asserts that Defendant "made a record of disability by classifying the Plaintiff as an unvaccinated employee" in accordance with a COVID-19 policy which assumed that unvaccinated employees "are impaired by a suppressed or weak immune system or respiratory system that makes them vulnerable to '[COVID]-19.'" (Dkt. No. 24, at 19). But there are no

---

[5] Plaintiff has not alleged that Defendant created a record of a history of an impairment; his allegation is based upon the misclassification prong.

facts alleged indicating that being unvaccinated is a disability or even that having a suppressed or weakened immune or respiratory system that makes an individual vulnerable to COVID-19 is a physical impairment that substantially limited a major life activity. Here the Plaintiff is challenging the Defendant's implementation of an office-wide COVID-19 policy. Plaintiff has repeatedly alleged that Defendant "applied the policy to everyone equally." (*Id.* at 20; *see also* Dkt. No. 24-2, at 31 (explaining that Defendant's COVID-19 policy "applies to all employees" at all workplaces based in the United States)). And that is consistent with the employee email notifications attached to the Amended Complaint. There is no plausible allegation that Defendant treated Plaintiff in a manner inconsistent with the policy. Plaintiff has failed to plausibly allege that making a record of his vaccination status, in accordance with the policy, constituted making a record of an impairment that substantially limits one or more major life activities. "[I]nferring that [Defendant] classified [Plaintiff] as impaired by requiring [him] to become vaccinated or seek an exemption would mean that [Defendant] considered all its employees to have an 'impairment,' which is of course not a plausible inference, particularly in light of the possibility of an exemption." *Speaks*, 2022 WL 348649, at *5, 2022 U.S. Dist. LEXIS 146840, at *11–12 (citation omitted); *see also Shklyar*, 2022 WL 2867073, at *4, 2022 U.S. Dist. LEXIS 129546, at *12 ("[T]he materials attached to [Plaintiff's] amended complaint show that [Defendant] classified [Plaintiff] in the same way that it classified all of its RD&I employees. Inferring that [Defendant] misclassified [Plaintiff] as having a disability would therefore require inferring that [Defendant] misclassified all of its RD&I employees as having a disability.").[6]

---

[6] Plaintiff's assertion that the COVID-19 policy *created* an impairment in his ability to work, by classifying him as unvaccinated, is backwards. (Dkt. No. 24, at 19). The issue is whether Plaintiff had an impairment that substantially limited one or more major life activities, not the effect of the Defendant's COVID-19 policy.

### 3.      Adverse Action Imposed Because of Plaintiff's Disability

Defendant argues that, in any event, it "did not take any adverse actions against Plaintiff due to perceived disability." (Dkt. No. 13-1, at 24–27). Plaintiff claims that Defendant imposed numerous adverse employment actions, including "the loss or threatened loss of pay, isolation, segregation, diminished employment opportunities, interference with his rights, interfering with his VISA immigration status, allowing other employees to harass the plaintiff with repetitive emails and intimidating interactions and finally firing [] [P]laintiff." (Dkt. No. 24, at 23–24). Defendant disputes that "employer mandated masking, testing and vaccines" are adverse actions. (Dkt. No. 13-1, at 25).

There can be no dispute that Plaintiff's termination was a "materially adverse change in the terms and conditions of employment" and therefore an adverse employment action. *See Davis v. N.Y. City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). It is unlikely that isolation and segregation constitute materially adverse changes to Plaintiff's employment. *See McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380, 387 (W.D.N.Y. 2013) (noting that "being given the proverbial cold shoulder by one's coworkers" or "being left out of meetings do[] not amount to [] adverse action[s]" (citations omitted)). However, without considering the viability of all of Plaintiff's alleged adverse actions, the Court finds that the discrimination claim fails because Plaintiff has failed to plausibly allege discriminatory motivation.

A plaintiff alleging an employment discrimination claim under the ADA must establish that his disability was the but-for cause of the adverse employment action. *See Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019). Here, Plaintiff has failed to plausibly allege that he would not have been subjected to an adverse employment action but for a disability. Based on Plaintiff's allegations and the voluminous exhibits attached to the complaint, Defendant's COVID-19 Policy was distributed to—and applied to—all employees based in the United States.

(Dkt. No. 24, at 4–5; Dkt. No. 24-2, at 31–32). And all unvaccinated employees of Defendant were given the same choice: seek and qualify for a medical or religious exemption from the COVID-19 Policy or be deemed to voluntarily quit their job. (Dkt. No. 24, at 5; Dkt. No. 24-2, at 115–16). These facts cannot support a plausible inference that Plaintiff would not have been terminated or subjected to an adverse employment action but for a disability.

Accordingly, the Court finds that Plaintiff has failed to state a discrimination claim under the ADA.

### B.    Retaliation Under the ADA

Claims for retaliation [under the ADA] are analyzed under the same burden-shifting framework established for Title VII cases." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *see Salas v. N.Y. City Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. Mar. 30, 2018) (explaining that the ADA and Title VII contain "nearly identical language, and retaliation claims under the two statutes are analyzed under the same framework" (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222–23 (2d Cir. 2001)). Thus, for a retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d at 90. Even if a plaintiff has not alleged that he has a disability under the ADA, he may still succeed on a retaliation claim if he plausibly alleges that he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated [the ADA]." *Morey v. Windsong Radiology Grp., P.C.*, 794 F. App'x 30, 33 (2d Cir. 2019) (summary order) (alteration in original). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10,

14–15 (2d Cir. 2013) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

### 1.    Protected Activity

Reading the Amended Complaint liberally, it appears that Plaintiff seeks to allege that the following constitute protected activities under the ADA:

- Plaintiff's November 16, 2021 emails to HR Manager McDermott "[d]ocumenting discrimination at work," requesting a "meeting . . . to discuss . . . the discrimination and harassment I have been experiencing," "attaching [his] notice of discrimination and all harassing communication [he] received over last several months." (Dkt. No. 24-2, at 79–80).

- Plaintiff's November 19, 2021 meeting with McDermott and a project manager, where he "was invoke[ed] [his] rights under ADA because [he] was being regarded as disabled by the company and [he] wanted to document the harassment and discrimination he "had been experiencing." (Dkt. No. 24-1, ¶ 27).

- Plaintiff's December 9, 2021, complaint to "Speak Up," "the company's global ethics complaint report system" that Defendant "regarded" him as disabled, "made a record of . . . disability" "by mis-classifying [him] as having, in ADA terms, a mental or physical impairment," and "coerc[ed] [him] to submit to medical examinations . . . without any informed consent." (Dkt. No. 24-1, ¶ 31; Dkt. No. 24-2, at 69–70).

- Plaintiff's December 10, 2021, filing of a charge of discrimination with the EEOC alleging discrimination and retaliation in violation of the ADA. (Dkt. No. 24-2, at 71–73).

- Plaintiff's December 12, 2021, email to McDermott stating that he was still "receiving harassing and discriminatory communication from my employer" and that he had attached the communication, and requesting that she save it in a "file EEOC can access." (*Id.* at 79).

- Plaintiff's December 16, 2021, emails to McDermott with copies of his EEOC complaint as well as his "response to the request of uploading vaccination status," in which he stated that Defendant "regards [him] as disabled" and that Defendant "has used policies and procedures . . . that interfere with ADA rights." (*Id.* at 79, 81, 84).

- Plaintiff's January 4, 2022, email to McDermott and McGrew complaining of harassment and discriminatory communications that regard him "as an individual with an actual or potential contagious disease and impaired immune and

respiratory systems" and that Defendant has been "coercing" him to submit to "medical interventions and examinations," such as wearing masks, "collecting vital statistics," and "experimental drug injections." (*Id.* at 113).

- Plaintiff's January 20, 2022, email in response to request that Plaintiff "upload proof of vaccination or reasonable accommodation qualification," stating that he "cannot use the form because it interferes with [his] rights under the ADA." (*Id.* at 122–23).

- Plaintiff's statement during calls on February 2, 2022, with McDermott and others that he was suffering "retaliation based on discrimination," (Dkt. No. 24-1, ¶ 43), and was "being regarded as disabled," (*id.* at ¶ 44).

- Plaintiff's February 2, 2022, "Notice" to McDermott and others asserting that he was being "regarded as disabled with a contagious disease" and that his rights under the ADA were being violated" (Dkt. No. 24-2, at 125–26).

Defendant asserts that Plaintiff's "opposition to Defendant['s] lawful COVID-19 mitigation policies" is not a protected activity under the ADA. (Dkt. No. 13-1, at 29). Plaintiff responds that his complaints were "based upon a good faith belief" that the Defendant's COVID-19 policy violated the ADA. (Dkt. No. 24, at 23). Construing Plaintiff's pro se complaint liberally, the Court assumes Plaintiff's complaints to management and human resources that Defendant's COVID-19 policy violated the ADA and that he was experiencing retaliation for raising issues of discrimination constitute protected activity. *See Speaks*, 2022 WL 3448649, at *6 n.9, 2022 U.S. Dist. LEXIS 146840, at *14 n.9 ("[I]n the context of a retaliation claim, the Court will construe [the plaintiff's] *pro se* Complaint liberally to sufficiently allege that she raised ADA concerns about the Company's COVID-19 policy, which would arguably constitute 'protected activity.'"). In any event, "filing [] a complaint with the EEOC is an activity protected by the ADA." *Lovejoy-Wilson*, 263 F.3d 208. And, in light of Plaintiff's allegation that he informed Defendant of the EEOC charge, Plaintiff has plausibly alleged that Defendant "was aware" of it. (Dkt. No. 24-1, ¶ 35; Dkt. No. 24-2, at 79–80); *see Weekes v. JetBlue Airways*

*Corp.*, No. 21-cv-1965, 2022 WL 4291371, at *10, 2022 U.S. Dist. LEXIS 167723, at *28 (E.D.N.Y. Sept. 16, 2022).

### 2.    Adverse Actions and Causal Connection

Generally, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under [the ADA]: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Id.* (quoting *Burlington N.*, 548 U.S. at 64). To determine "whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

While the Second Circuit has not yet confirmed that but-for causation applies to ADA retaliation claims, this Court joins the majority of district courts in applying this heightened standard. *See Heiden v. N.Y.C. Health & Hosps. Co.*, No. 20-cv-10288, 2023 WL 171888, at *21, 2023 U.S. Dist. LEXIS 5583, at *69 (S.D.N.Y. Jan. 11, 2023) (citing *Norman v. NYU Langone Health Sys.*, Nos. 20-3624-cv and 20-3745-cv, 2021 WL 5986999, at *5, U.S. App. LEXIS 37365, at *5 (2d Cir. Dec. 17, 2021) (summary order)). "'But-for' causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan v. City of N.Y.*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 91). "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse

employment action," *Vega*, 801 F.3d at 90, or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant,'" *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). In any event, here, the Court concludes that Plaintiff has failed to allege not only but-for causation, but causation under the lesser "substantial or motivating factor" standard.

Plaintiff alleges Defendant subjected him to a number of adverse actions, specifically, that Defendant "segregate[d] and isolate[d] the plaintiff, exclude[d] him from certain office areas, restrict[d] his movement," harassed him with "repetitive" and intimidating emails and "interactions," denied him the right to refuse medical inquiries, threatened interference with his VISA status, and termination. (Dkt. No. 24, at 23–24).

### a.    Segregation, Isolation, and Medical Procedures

Viewing the Amended Complaint to raise the strongest claims it suggests, it appears that Plaintiff's allegations of segregation, isolation, restriction of movement, and required medical procedures, stem from Defendant's various masking and social distancing policies, some of which depended on vaccination status, and which were communicated to employees via email and posted in signs throughout the office. (*See* Dkt. No. 24, at 7 (alleging that "between May 8, 2020 through November 8, 2021" Defendant informed "plaintiff and his colleagues" "of a newly adopted COVID-19 policy" which told all employees to wear masks and gloves at work . . . to answer daily medical inquiries . . . to remain physically isolated from other workers . . . to limit his access to certain office areas based upon . . . 'vaccine status,' and to accept segregation based on 'vaccine status.'"); Dkt. No. 24-1, ¶ 17 (alleging that on August 17, 2021, the Risk management team posted more harassing signs throughout the office which state that access to the office is restricted and segregated to employees based on their status of complying with certain medical procedures," i.e., vaccination)). Even assuming Plaintiff adequately alleges these

are adverse actions, they all occurred *prior to* Plaintiff's first alleged instance of protected

conduct on November 16, 2021. *See Hexemer v. Gen. Elec. Co.*, No. 12-cv-1808, 2015 WL

3948418, at *8, 2015 U.S. Dist. LEXIS 83663, at *20 (N.D.N.Y. June 29, 2015) ("[T]o establish

that an adverse employment action was caused by an employee's protected activity, the

employer's decision to act adversely to the employee must postdate the protected activity.").

Thus, Plaintiff has failed to allege facts that would allow a plausible inference of a causal

connection.

### b.   Intimidating Interactions

Plaintiff alleges that he was subjected to "intimidating interactions" in retaliation for his

protected conduct. Although Plaintiff does not identify these interactions, the Court construes the

Amended Complaint as alleging two: Plaintiff alleges that on August 18, 2021, McGrew "came

up to me in the hallway, and he demanded that I cover my face with a mask," (Dkt. No. 24-1, ¶

18), and that on November 16, 2021, during the meeting when Plaintiff first complained that

Defendant was violating the ADA, McDermott "called" him "unvaccinated" "and asked me to

wear a mask," (*id.* ¶ 27). The August 18, 2021 interaction with McGrew predated Plaintiff's

protected conduct, thus there is no causal connection. And even assuming there is a causal

connection between McDermott's November 16, 2021 conduct toward Plaintiff and his

complaint of ADA discrimination, which occurred at the same meeting, hostile behavior, without

more, is insufficient to allege an adverse action. *See Tepperwien v. Entergy Nuclear Operations,*

*Inc.*, 663 F.3d 556, 568–72 (2d Cir. 2011) (holding that investigatory sessions, counseling,

threats of termination, hostile behavior during meeting, being made to come to work on day off

under false pretenses, and being switched to night shift were not materially adverse actions for retaliation claim).[7]

### c.  Harassing Emails

Plaintiff also alleges that Defendant "allow[ed] other employees to harass [him] with repetitive emails." (Dkt. No. 24, at 24). Plaintiff attached to the Amended Complaint, numerous emails outlining Defendant's COVID-19 policies and procedures, mask policies, and vaccination policies. (*See generally* Dkt. No. 24-2 (emails dated May 8, 2020 to January 18, 2022)). However, the emails Plaintiff characterizes as harassing were often sent to "Everyone," or contained attachments with general, company-wide COVID-19 policies and updates that were not directed to Plaintiff personally, (*see, e.g.*, Dkt. No. 24-2, at 2 (email addressed to "Everyone"), 15 ("North America COVID-19 Weekly Update")). Even viewing the emails collectively, and crediting Plaintiff's allegation that they were "repetitive," the Court concludes Plaintiff fails to allege any facts that would allow a plausible inference that the email he received was more than a "petty slight[] or minor annoyance[]." *Burlington N.*, 548 U.S. at 68. Thus, Plaintiff fails to allege the emails were an adverse action.

### d.  Threat to VISA Status

As part of Plaintiff's initial job offer, Defendant stated it would support Plaintiff's "application for work authorization, in accordance with USCIS regulations." (Dkt. No. 24-2, at 154). Plaintiff alleges that Defendant retaliated against him for complaining of ADA discrimination by "interfering with his VISA immigration status." (Dkt. No. 24, at 24). Specifically, Plaintiff alleges that on November 19, 2021, McDermott said, "if [Plaintiff] didn't

---

[7] To the extent Plaintiff alleges his conversations with McDermott and Schrader on February 2, 2022 regarding his February 4, 2022, termination were also "intimidating interactions," (Dkt. No. 24-1, ¶¶ 43–44), they fail for the same reason.

comply, [he had] better be sure that [his] immigration process had been worked through as they were not going to support it anymore," (Dkt. No. 24-2, ¶ 27), and that when Shrader called him on February 2, 2022, to inform Plaintiff he would "be forced to 'quit' on February 4," Shrader also said that "as soon as" Plaintiff was "not employed the company is going to stop [his] visa and green card process," (*id.* ¶ 43). However, Plaintiff offers no facts, beyond his conclusory allegation that Defendant was "interfering with his VISA immigration status," from which the Court could plausibly infer that Defendant stopped supporting, or took any action with respect to, his immigration process following termination. In general, without more, threats of disciplinary action, or even termination, do not constitute adverse actions for the purpose of a retaliation claim. *See Tyson v. Town of Ramapo*, No. 17-cv-4990, 2019 WL 1331913, at *14, 2019 U.S. Dist. LEXIS 48875, at*38–39 (S.D.N.Y. Mar. 25, 2019) (finding the plaintiff's allegations that she received two letters threating to terminate her employment were insufficient to allege adverse action). As the Second Circuit has explained, "empty verbal threats do not cause an injury, and therefore are not material adverse actions, where they are unsupported by any other actions." *Tepperwien*, 663 F.3d at 571 (quoting *Vazquez v. Southside United Hous. Dev. Fund Corp.*, No. 06-cv-5997, 2009 WL 2596490, at *12, 2009 U.S. Dist. LEXIS 74480, at *38 (E.D.N.Y. Aug. 21, 2009)). The Court therefore concludes that Plaintiff has failed to allege sufficient facts from which to plausibly infer that Defendant's threats regarding his VISA status constituted a materially adverse employment action.

### e.      Termination

Defendant does not dispute that Plaintiff's February 4, 2022, termination constitutes an adverse action. However, Plaintiff fails to allege facts that would allow a plausible inference of a causal connection between his protected conduct and termination. Defendant's COVID-19 policy—"which was undisputedly the grounds for [Plaintiff's] termination when [he] chose to

remain unvaccinated—was enacted *before* [Plaintiff] spoke up in opposition to the vaccination

requirement." (Dkt. No. 13-1, at 30–31; Dkt. No. 24, at 4–5); *Speaks*, 2022 WL 3448649, at *6,

2022 U.S. Dist. LEXIS 146840, at *14–15 (emphasis in original). Defendant's COVID-19 policy

was in place as of October 27, 2021. (Dkt. No. 24-2, at 31). Plaintiff's first alleged protected

activity was on November 16, 2021. (Dkt. No. 24, at 8; Dkt. No. 24-1, ¶ 24). Thus, Plaintiff fails

to allege a plausible retaliation claim based on his February 4 termination. *Johnson v. Mount

Sinai Hosp. Grp., Inc.*, No. 22-cv-2936, 2023 WL 2163774, at *7, 2023 U.S. Dist. LEXIS 2980,

at *21 (E.D.N.Y. Feb. 22, 2023) (dismissing ADA retaliatory discrimination claim explaining

that even though "the plaintiff's refusal to comply with the defendant's COVID-19 policies was

clearly the basis for her termination," the plaintiff could not show a causal connection between

her opposition to those policies and her termination because "the defendant adopted its policies

before the plaintiff objected to vaccinations and masking"); *Shklyar*, 2022 WL 2867073, at *5,

2022 U.S. Dist. LEXIS 129546, at *15 (finding no causal connection in a retaliation claim

because "[the employer] initially implemented its COVID-19 policies in May 2020," but plaintiff

did not claim a protected status or notify her employer of her opposition to the policies until May

2021). Indeed, "[c]ourts regularly dismiss retaliation complaints in these circumstances, because

the consequences for non-compliance with the policy were established before any alleged

protected activity occurred." *Jorgenson*, 2023 WL 1472922, at *6, 2023 U.S. Dist. LEXIS

18463, at *16 (citations omitted).

Accordingly, Defendant's motion to dismiss Plaintiff's ADA retaliation claim is granted

and Plaintiff's motion to amend is denied as futile.

#### C.      Other Alleged Violations of the ADA

##### 1.      Hostile Work Environment

Plaintiff alleges that he was "harassed at [his] job . . . based on disability." (Dkt. No. 24-1, ¶ 2). To the extent Plaintiff seeks to raise a hostile work environment claim, he fails to plausibly state such a claim. The Second Circuit has recognized "that hostile work environment claims are cognizable under the ADA," *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 69 (2d Cir. 2019) (citation omitted), and evaluates the claims under the Title VII hostile work environment framework, *id.* at 74 (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). To prevail on such a claim, Plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Id.* (citation omitted). As an initial matter, Plaintiff's hostile work environment claim fails because he failed to plausibly allege a disability. *Garcia v. Kings Cnty. Hosp. Ctr.*, No. 16-cv-3151, 2018 WL 389212, at *6, 2018 U.S. Dist. LEXIS 5508, at *17 (S.D.N.Y. Jan. 11, 2018) ("To succeed on a hostile work environment claim . . . a plaintiff must allege that [he] was subjected to hostility because of her membership in a protected class."). Further, Plaintiff has failed to plausibly allege that his workplace "was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Alfano*, 294 F.3d at 373–74; *see Linne v. Alameda Health Sys.*, No. 22-cv-04981, 2023 WL 375687, at *2, 2023 U.S. Dist. LEXIS 12055, at *6 (N.D. Cal. Jan. 24, 2023) ("[T]here is nothing inherent in a policy equally instituting COVID protections to employees that is naturally harassing and Plaintiff does not allege any facts upon which to conclude otherwise.").

Plaintiff also alleges that Defendant constructively discharged him in violation of the ADA by "creat[ing] or deliberately permit[ting] such intolerable working conditions . . . that []

31

[P]laintiff reasonably felt he had no choices but to refuse to participate in these intolerable

working conditions." (Dkt. No. 1, at 26–32). "Where an alleged constructive discharge claim

stems from an alleged hostile work environment," the "standard is higher than the standard for

establishing a hostile work environment." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d

712, 725 (2d Cir. 2010) (citation omitted). Thus, Plaintiff fails to plausibly allege a constructive

discharge claim.

### 2.      Medical Inquiries and Medical Examinations

The ADA provides:

> A covered entity shall not require a medical examination and shall
> not make inquiries of an employee as to whether such employee is
> an individual with a disability or as to the nature or severity of the
> disability, unless such examination or inquiry is shown to be job-
> related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A); *see* 29 C.F.R. §§ 1630.13(b), 1630.14(c). "[A] plaintiff need not

prove that he . . . has a disability unknown to his . . . employer in order to challenge [such] a

medical inquiry or examination." *Conroy v. N.Y.S. Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d

Cir. 2003). A covered entity must keep any medical information obtained from such

examinations or inquiries confidential. 42 U.S.C. § 12112(d)(4)(C).

Plaintiff alleges that Defendant violated the ADA by making "disability-related" medical

inquiries and subjecting him to "non-job-related medical examinations" by asking for his

vaccination status and whether he had contact "with any 'infectious people'" and by requiring

testing for COVID-19 and daily temperature screenings. (Dkt. No. 24, at 8, 14–15, 20–21; Dkt.

No. 24-1, ¶ 13). Defendant does not specifically address Plaintiff's prohibited medical inquiry

and examination claims in its motion to dismiss, but generally argues that its company-wide

COVID-19 policies and vaccination requirement were applicable to all employees and consistent

with federal and state law. (Dkt. No. 13-1, at 23–26). Defendant further argues that the "EEOC

has . . . publicly advised employers" that requiring employees to take COVID-19 tests and daily health assessments "is permissible under the ADA as they are job related and related to 'a business necessity.'" (*Id.* at 23 n.9 (citing What Should You Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws at Paragraphs G.2, K.1, and K.4, available at https://www.eeoc.gov/wysk/what-youshould-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws)).

"The ADA does not forbid all medical inquiries, but only those 'as to whether such employee is an individual with a disability or as to the nature or severity of the disability.'" *Conroy*, 333 F.3d at 95 (quoting 42 U.S.C. § 12112(d)(4)(A)). Plaintiff has not alleged facts plausibly suggesting that a vaccine attestation, an inquiry regarding whether he had contact "with any 'infectious people,'" COVID-19 testing, and daily temperature screenings are inquiries or medical examinations[8] that "would reveal disabilities." *Id.* at 95; *cf.*, *id.* at 95–96 (finding that the employer's requirement that employee provide medical certification containing a "general" diagnosis following certain absences was a prohibited inquiry because a diagnosis may "reveal an impairment which is 'inherently substantially limiting,'" or "give rise to the *perception* of a disability"); *see also Jorgenson*, 2023 WL 1472022, 2023 U.S. Dist. LEXIS 18463, at *11–12 (finding no violation of § 1630.13(b) where the defendant required the plaintiff to attest to

---

[8] The parties have not addressed whether Defendant's alleged actions constitute "medical inquires" or "medical examinations." *See Conroy*, 333 F.3d at 96 (noting that EEOC Guidance explains that "'disability-related inquiry' is a question that is likely to elicit information about a disability, such as asking employees about: whether they have or ever had a disability; the kinds of prescription medications they are taking; and, the results of any genetic tests they have had" (quoting *Questions and Answers: Enforcement Guidance on Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) ("EEOC Enforcement Guidance")*, 2000 WL 33407181, at *3 (EEOC, July 27, 2000))); *see also EEOC Enforcement Guidanc*e, 2000 WL 33407181, at *3 (explaining "medical examination" is a procedure or test that seeks information about an individual's physical or mental impairments or health"). Nor have the parties addressed whether a medical examination, like a medical inquiry, is permissible so long as it "would [not] reveal disabilities," *Conroy*, 333 F.3d at 96, or whether a medical examination must always "be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Because the Court concludes that it is apparent from the face of the Amended Complaint, that that Defendant's COVID-19 inquiries and/or examinations are job-related and consistent with business necessity it need not reach this issue.

whether he received the COVID-19 vaccine because the "attestation requirement did not

constitute a medical examination or an inquiry about a disability"); *Chancey v. BASF Corp.*, No.

3:22-cv-34, 2022 WL 18438375, at *4, 2022 U.S. Dist. LEXIS 236598, at *8 (S.D. Tex. Dec. 29,

2022) (finding allegations that employer required weekly antigen testing , implemented "close

contact" quarantine measures, and "classified" the plaintiff as "unvaccinated" failed to allege

"any action that meets the definitions of a disability-related inquiry or medical examination,"

explaining that employer's "actions as alleged by the plaintiff, are consistent with recent EEOC

guidance specifically related to the COVID-19 pandemic" (citing

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-

and-other-eeo-laws)); *McCone v. Exela Techs., Inc.*, No. 21-cv-912, 2022 WL 801772, at *4,

2022 U.S. Dist. LEXIS 45734, at *10 (M.D. Fla. Jan. 14, 2022) (finding no ADA violation

where an employer required COVID-19 testing prior to entering the workplace because

"COVID-19, standing alone, does not meet the ADA's definitions of disability or impairment"

and "a COVID-19 test is not 'likely to reveal a disability.'"), *report-recommendation adopted*

2022 U.S. Dist. LEXIS 45732 (M.D. Fla. Mar. 15, 2022).

Even assuming such inquiries or examinations were impermissible under 42 U.S.C. §

12112(d)(4)(A), because it is apparent from the Amended Complaint and its attachments that

they were job-related and consistent with business necessity, the Court concludes Plaintiff's §

12112(d)(4)(A) must be dismissed. The question of whether a medical inquiry or medical

examination is consistent with business necessity "is an affirmative defense as to which the

employer has the burden of proof." *Transp. Workers Union of Am., Local 100, AFL-CIO v. New

York City Transit Auth.*, 341 F. Supp. 2d 432, 446 (S.D.N.Y. Oct. 12, 2004). However, "[a]n

affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6),

without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) (citations omitted).

The Second Circuit has explained that to satisfy the exception to disability-related medical inquiries and medical examinations, an employer must show that the asserted business necessity is "vital to the business," that the examination "genuinely serves the asserted business necessity," and that "the request is no broader or more intrusive than necessary." *Conroy*, 333 F.3d at 97–98.[9] "The employer need not show that the examination . . . is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal." *Id.* at 98. "[E]nsuring that the workplace is safe and secure" may constitute a business necessity. *Id.* at 97. "[T]he business necessity standard is quite high." *Id.* at 95.

Here, Plaintiff has attached to the Amended Complaint the email, signs, and documents Defendant distributed to employees outlining its policies and procedures, including daily screening questions before entering the building that ask whether an employee has "[c]ome into contact with a person infected with the Coronavirus?" (Dkt. No. 24-2, at 7), a temperature check before entering "your office area or desk," (*id.*), a notice that certain customers were requiring COVID-19 testing prior to entry into provider facilities,[10] (*id.* at 55), and a notice that employees are required to be vaccinated, (*id.* at 31). Defendant explained that it was implementing these

---

[9] The Second Circuit has also instructed that when a "general policy" is at issue—as opposed to an inquiry or examination directed toward an individual—courts must consider whether the employer, "[i]n defining a class subject to a general policy," has shown "that it has reasons consistent with business necessity for defining the class in the way that it has." *Conroy*, 333 F.3d at 101.

[10] Plaintiff does not allege specific facts indicating that Defendant required him to submit to testing for COVID-19 when not required by a customer. (*See, e.g.*, Dkt. No. 24, at 19 (vaguely alleging that "[t]he defendant made a record of disability by classifying the plaintiff as an 'unvaccinated' employee, and classifying him as needing to wear a mask and self-test")).

policies and procedures in light of the "highly transmissible" nature of COVID variants and in

reliance on CDC and federal guidance, (*id.* at 22), in an effort to "to ensure the safety of our

essential employees" who were required to report to work in-person, (*id.* at 11), and to protect

"the health and wellbeing of our employees," and as part of its "preparations to ensure we can

safely open our doors to more employees, in accordance with both local government and Phillips

policies," (*id.* at 17). Defendant explained that the decision to require all employees to be

vaccinated, was made in accordance with the federal mandate requiring "all federal workers to

be vaccinated against COVID, which extends to federal contractors like Philips" and that it

"believe[d] it is the right thing to do as a health technology company." (*Id.* at 31). In addition, the

guidance EEOC itself provided employers recognized that daily health assessments and

temperature screening, even if "medical examinations" are permissible measures for, inter alia,

preventing the workplace transmission of COVID-19. *See* https://www.eeoc.gov/wysk/what-you-

should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Mar. 6,

2023).[11] Thus, the Court concludes that the business necessity for the COVID-19 related

---

[11] For example, the EEOC advised:

> A.2. When screening employees entering the workplace during this time, may an employer only ask employees about the COVID-19 symptoms EEOC has identified as examples, or may it ask about any symptoms identified by public health authorities as associated with COVID-19? (4/9/20)
>
> As public health authorities and doctors learn more about COVID-19, they may expand the list of associated symptoms. Employers should rely on the CDC, other public health authorities, and reputable medical sources for guidance on emerging symptoms associated with the disease. These sources may guide employers when choosing questions to ask employees to determine whether they would pose a direct threat to health in the workplace. For example, additional symptoms beyond fever or cough may include new loss of smell or taste as well as gastrointestinal problems, such as nausea, diarrhea, and vomiting.
>
> A.3. When may an ADA-covered employer take the body temperature of employees during the COVID-19 pandemic? (3/17/20)
>
> Generally, measuring an employee's body temperature is a medical examination. Because the CDC and state/local health authorities have acknowledged

inquiries and examinations, including the need to prevent the spread of COVID-19 in the workplace, the need to follow customer premises requirements, and the need to follow federal and state guidance on vaccination during the times alleged in the Amended Complaint, is apparent from the face of the Amended Complaint and its attachments. The Court further concludes that the daily screenings, temperature checks, COVID-19 testing at customers' requests, and vaccination attestations, was "a reasonably effective method of achieving the employer's goal" of preventing the spread of COVID-19 in the workplace and ensuring the safety of its employees. *Conroy*, 333 F.3d at 98. Accordingly, Plaintiff's medical claims and medical examination claim is dismissed and his motion to amend is denied as futile.

Further, Plaintiff has not plausibly alleged that Defendant failed to keep his medical information confidential. A covered entity must keep any medical information obtained from medical examinations or medical inquiries confidential. 42 U.S.C. § 12112(d)(4)(C). Plaintiff alleges that Defendant posted signs restricting access to the office based on vaccination status and that "everyone [would] know who is 'vaccinated' by the access they get." (Dkt. No. 24-1, ¶ 17). Defendant's signs require that all employees wear masks, but state that fully vaccinated employees "may" remove their masks "[a]lone in closed-door room[s]" and "[s]itting at [their] desk/workspace," while unvaccinated employees may not do so. (Dkt. No. 24-2, at 24). But Defendant's policy does not require fully vaccinated employees to remove their masks—fully vaccinated employees who choose to wear their masks and unvaccinated employees who must wear their masks are indistinguishable. (*Id.*). Thus, Plaintiff fails to plausibly allege that

---

community spread of COVID-19 and issued attendant precautions, employers may measure employees' body temperature. However, employers should be aware that some people with COVID-19 do not have a fever.

https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Mar. 6, 2023).

Defendant's masking policy disclosed Plaintiff's vaccination status. *Cf. Mahran v. Benderson Dev. Co., LLC*, No. 10-cv-715A, 2011 WL 1467368, at *1, *5, 2011 U.S. Dist. LEXIS 41599, at *4, *14 (W.D.N.Y. Apr. 18, 2011) (finding that the plaintiff plausibly alleged a violation of the ADA confidentiality requirement where the defendant's representative "intentionally disclosed confidential medical information" to the plaintiff's coworkers).[12] Accordingly, Plaintiff's confidentiality claims are dismissed and his motion to amend is denied as futile.

### 3.    Reasonable Accommodation

Nor do Plaintiff's remaining allegations of ADA violations plausibly support a claim. While Defendant must make reasonable accommodations to the known limitations of an employee with a disability, 42 U.S.C. § 12112(b)(5)(A), Plaintiff has not plausibly alleged that he had a disability, *see McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009) (explaining that, to state a claim under the ADA for failure to accommodate, the plaintiff must establish that, inter alia, "[p]laintiff is a person with a disability under the meaning of the ADA" (citation omitted)). Thus, Plaintiff has failed to plausibly allege a reasonable accommodation claim. (Dkt. No. 24, at 20 (citing 29 C.F.R. § 1630.9(d))). Nor is the "individualized assessment" language from 29 C.F.R. § 1630.2(r) in any way relevant. (Dkt. No. 24, at 6 & n.1). This provision, which defines "direct threat," applies to an employer's affirmative "direct threat" defense, and how an employer must decide whether an individual poses a "direct threat to the health or safety of others," such as to preclude liability under the

---

[12] To the extent Plaintiff argues that Defendant disclosed his medical information to customers, he fails to plausibly state such a claim. (Dkt. No. 24-1, ¶ 19). Plaintiff alleges that Defendant wanted him to receive a COVID-19 vaccine because "customers [were] demanding that [he] get injections." (*Id.*). Plaintiff also alleges that Defendant "is telling all customers that [he is] contagious." (*Id.*). There are no facts supporting these conclusory assertions, Plaintiff points to an email with the subject line "Safe@Work Update: Customer facing requirements," which states that "all U.S. [] employees in a customer-facing role [are required to] meet our customers' requirements for medical testing and vaccinations, including immunization against COVID-19, before entering their facility." (Dkt. No. 24-2, at 25). There are no factual allegations concerning Defendant's communications with customers about Plaintiff's vaccination status.

ADA. 42 U.S.C. § 12182(b)(3); *see Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 345–46 (S.D.N.Y. Jan. 13, 2010).[13] Accordingly, Plaintiff's remaining allegations of ADA violations are dismissed and Plaintiff's motion to amend is denied as futile.

### D. Dismissal of State Law Claims

Having found Plaintiff's Amended Complaint futile, and having found no plausible ADA claim, the Court declines, in its discretion, to retain supplemental jurisdiction over the state-law contract claims enumerated in the original complaint. (Dkt. No. 1); *see* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). With the dismissal of the federal claims prior to the investment of significant judicial resources, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350). Accordingly, Plaintiff's state law claims are dismissed without prejudice.

### E. Motion to Strike

"Plaintiff moves to strike defendant's motion or certain statements [in the motion], some of which are legal citations," on the ground that such statements and citations are irrelevant or "factually incorrect," or "erroneous legal conclusions that conflict with existing law." (Dkt. No. 21, at 47). That Plaintiff disagrees with Defendant's analysis of the caselaw is evident in his opposition papers, where he has set forth his arguments in this regard at length. (Dkt. Nos. 16,

---

[13] Plaintiff has already sought to amend once and has not provided any facts indicating that any further amendment concerning a claim under the ADA would be anything other than futile. *See Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) ("Although district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings, leave to amend need not be granted when amendment would be futile.").

18, 21). However, Plaintiff cites nothing that suggests Defendant's motion is frivolous or made in bad faith. Accordingly, Plaintiff's motion to strike is denied.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim (Dkt. No. 13) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion to amend (Dkt. No. 24) is **DENIED** as futile; and it is further

**ORDERED** that Plaintiff's motion to strike (Dkt. No. 21), is **DENIED**; and it is further

**ORDERED** that the ADA claims in the Complaint (Dkt. No. 1) are **DISMISSED with prejudice** and the state-law claims are **DISMISSED without prejudice**; and it is further

**ORDERED** that the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated:  <u>March 7, 2023</u>
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

40